

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RUSH TRUCK CENTERS OF TEXAS, L.P. d/b/a RUSH ENTERPRISES, INC., a/k/a RUSH TRUCK CENTER-EL PASO, | § § § | No. 08-22-00226-CV |
| Appellant, | § | Appeal from the |
| v. | § | 448th Judicial District Court |
| ROSARIO Y. MENDOZA, Individually and on Behalf of the Estate of MARCO A. HOYOS MARTINEZ, | § § | of El Paso County, Texas (TC# 2022DCV0350) |
| Appellee. | § | |

## **O P I N I O N**

### **BACKGROUND**

In a single issue, Appellant challenges the denial of a motion to stay proceedings and compel arbitration. We reverse.

#### *Factual Background and Procedural Background*

Appellant, Rush Truck Centers of Texas, L.P. (Rush), is a Texas truck dealership that engages in the sale of heavy and medium duty trucks, and provides parts, service, and body work for heavy and medium duty trucks. Marco A. Hoyos Martinez, was initially hired by Rush in 2019 as a fabricator at Rush's Denton, Texas office. As part of Rush's electronic onboarding process,

Hoyos was required to create a username and password to access and sign his onboarding documents. In April 2020, Hoyos was furloughed due to the COVID-19 pandemic. In October 2020, an offer to rehire Hoyos as a Body Service Technician Level II was made by Rush Truck Centers of El Paso. Hoyos used the same electronic onboarding system from 2019 for the execution of the 2020 onboarding documents after he was rehired. The 2020 onboarding documents included the "Employment At-Will and Arbitration Agreement" (the Arbitration Agreement). Hoyos accessed the Arbitration Agreement with his personal credentials and electronically signed it on November 5, 2020. Hoyos then began working for Rush again.

On November 23, 2020, Hoyos fatally fell from a ladder as he was cleaning a vocational garbage disposal truck with soapy water to prepare it for re-painting. A workers' compensation claim was filed and Appellee, Rosario Y. Mendoza (Mendoza), is currently receiving death benefits under the Texas Workers' Compensation Act (TWCA) as his surviving spouse.[1, 2] On January 31, 2022, Mendoza initiated a gross negligence and workers' compensation lawsuit against Rush after her late husband's death.

The pleadings allege the gross negligence claim is based on Rush's failure: to instruct Hoyos on the use of an unsecured ladder at heights above six feet; to provide necessary and proper training; to provide fall protection; to supervise; to allow ventilation; provide noxious fume protection, and other proper personal protective equipment, and therefore, breached its non-delegable duty to provide a safe workplace to its employees. On June 29, 2022, Rush filed its motion to stay proceedings and compel arbitration. Mendoza opposed the motion, and a hearing

---

[1] It is undisputed Rush maintained a workers' compensation insurance policy and Hoyos was an employee covered by workers' compensation insurance at the time of his death.

[2] The record is not clear as to who filed the workers' compensation claim.

was held. On October 11, 2022, the trial court denied the motion to stay proceedings and compel arbitration. This accelerated appeal followed.

## DISCUSSION

In a single issue, Rush challenges the denial of its motion to stay proceedings and compel arbitration. First, Rush maintains there is a valid arbitration agreement and Mendoza's claims fall within the scope of the Arbitration Agreement. Second, Rush did not waive its right to arbitration, and the Arbitration Agreement remains within the Federal Arbitration Act's coverage because the exception for individuals personally engaged in interstate commerce does not apply. We agree.

### *Standard of Review*

We review the trial court's ruling on a motion to compel arbitration based on an abuse of discretion standard. *CC Rest., L.P. v. Olague*, 633 S.W.3d 238, 241 (Tex. App.—El Paso 2021, pet. dism'd). The trial court "clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 207 (Tex. App.—El Paso 2004, orig. proceeding). The question of whether an arbitration agreement is valid and enforceable is a question of law we review de novo. *Solcius, LLC v. Meraz*, No. 08-22-00146-CV, 2023 WL 2261414, at *4 (Tex. App.—El Paso Feb. 27, 2023) (mem. op.). We also review the trial court's purely legal determinations de novo, and any clear failure to correctly determine the law constitutes an abuse of discretion. *Olague*, 633 S.W.3d at 241. If a valid and enforceable arbitration agreement exists covering Mendoza's claims, the trial court abused its discretion in failing to compel arbitration. *Id.* (citing *Firstlight Federal Credit Union v. Loya*, 478 S.W.3d 157, 161 (Tex. App.—El Paso 2015, no pet.)).

### A. Validity of the Arbitration Agreement

As a threshold matter, we begin our analysis with determining whether a valid arbitration agreement exists. As the party moving to compel arbitration, Rush must prove a valid arbitration agreement exists and Mendoza's claims at issue fall within the scope of that agreement. *Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013). Upon doing so, the burden shifts to Mendoza to disprove the existence of a valid and enforceable arbitration agreement. *See In re DISH Network, L.L.C.*, 563 S.W.3d 433, 441 (Tex. App.—El Paso 2018, orig. proceeding).

### (1) Contract formation

For an arbitration agreement to be valid, it must contain the state law-required contract elements. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227–28 (Tex. 2003); *Olague*, 633 S.W.3d at 241. A binding contract requires: (1) "an offer"; (2) "an acceptance in strict compliance with the terms of the offer"; (3) "a meeting of the minds"; (4) "each party's consent to the terms"; and (5) "execution and delivery of the contract with intent that it be mutual and binding." *Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 692 (Tex. App.—El Paso 2015, pet. denied).

The Texas Uniform Electronic Transactions Act (the Act) was enacted considering the increasing use of electronic contracts. *Solcius*, 2023 WL 2261414, at *4 (internal citations omitted). In a contest to the validity of an electronic signature and whether it is attributable to an individual, the focus is on the efficacy of the security procedures applied in the electronic transaction. *Id.*; TEX. BUS. & COM. CODE ANN. § 322.009(a) ("An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable."). Once the parties have agreed to conduct business by electronic means, the party seeking to enforce

the electronic signature must present evidence to establish the efficacy of the security procedures utilized in the transaction. *Solcius*, 2023 WL 2261414, at *4 (citing *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 (Tex. 2021)). A security procedure is defined by the Act as

> a procedure employed for the purpose of verifying that an electronic signature, record, or performance is that of a specific person or for detecting changes or errors in the information in an electronic record. The term includes a procedure that requires the use of algorithms or other codes, identifying words or numbers, encryption, or callback or other acknowledgment procedures.

TEX. BUS. & COM. CODE ANN. § 322.002(13).

The party opposing enforcement of an electronic agreement may present evidence to undermine the security procedures utilized in the transaction by showing it "lack[ed] integrity or effectiveness[.]" *Solcius*, 2023 WL 2261414, at *5 (citing *Aerotek*, 624 S.W.3d at 210). When the efficacy of the security procedures has been conclusively established and the party opposing enforcement has failed to present evidence of fraud or lack of reliability, a court must enforce the contract. *See id*.

### (2) Efficacy of Rush's security procedures

We begin by noting Mendoza does not contest the parties' agreement the onboarding process would be electronic; she does, however, contest the validity of the electronic signature and whether it can be attributed to Hoyos. Thus, we need only consider whether Rush provided evidence to support a finding that the electronic onboarding system—the security procedure at issue—was sufficient to conclusively establish the genuine nature of Hoyos's signature. *See id*. We conclude it did.

According to Mendoza, there is no evidence of the efficacy of the onboarding system because the onboarding record summary does not specify the applicable time zone or the location of the computer Hoyos used when he signed the Arbitration Agreement. Although Mendoza

5

acknowledges the records summary identifies an IP address, she claims it is nonetheless unreliable because it does not identify the computer Hoyos used. She also points us to "inaccuracies" in the records summary—the summary indicates one of the events on the Arbitration Agreement was updated before Hoyos viewed the documents. In addition, Mendoza claims the insufficiency of the safety procedures is further shown by the lack of any Rush employee (1) observation of Hoyos completing the onboarding system; (2) speaking to him directly while he completed the onboarding process; or 3) reviewed his responses. We disagree.

When Hoyos was hired in October 2020, he was required to create credentials—a username of his choice, which would be his email address, and a password of his choice—to electronically access the onboarding documents for his employment. Hoyos created his own credentials and logged into the system using his username and password to access the onboarding documents.

Kipp Sassaman, Rush's authorized representative and Vice President of Human Resources, was deposed by Mendoza regarding Rush's electronic onboarding system. Sassaman explained Hoyos provided authorization to accept signatures electronically, had to physically view and sign the Arbitration Agreement by clicking "Sign and agree," which then would have inserted his electronic signature in the respective signature block. The system automatically dated and saved the time Hoyos signed the Arbitration Agreement.

| Sassaman: | He signed electronically, it put the signature in the signature line and the date above it. |
| Appellant's counsel: | That is Mr. Hoyos put the date there or -- strike that. Whoever was filling out this form, if they did, in fact, fill it out, was that Hoyos or was that put there by the person filling it out, or was that done electronically by your computer from your company? |
| Sassaman: | It would have been the date he signed it and it would have been inserted electronically. |

| | |
|---|---|
| Appellant's counsel: | So that would have been done electronically by something in your company, correct? |
| Sassaman: | That would have been based on the information Mr. Hoyos entered into the system . . . the date of his signature. |
| Appellant's counsel: | The question is simple: The blank that is filled out . . . is that done by the person on the other end of the computer, or is that done by your systems at Rush Truck Center? |
| Sassaman: | Again, when he agreed to sign electronically and signed it electronically, the day he signed that would have been inserted -- it would have been captured in the software and inserted into the document. |
| Appellant's counsel: | How does that capture it? |
| Sassaman: | I don't know how the software is built, but it's -- |
| Appellant's counsel: | It's automatic? . . . |
| Sassaman: | Correct. |
| Appellant's counsel: | What is the name of the software? |
| Sassaman: | This document would have been signed as part of the onboarding, so the software we use is UKG. |

Sassaman testified Hoyos did not provide his email address or password to Rush, and neither Rush, nor any employees, have the ability to access his account. According to Sassaman, the username and password an employee creates ensures the system is secure and only the employee can access his or her account. Once an individual agrees to sign documents electronically, they would then select "Sign and agree" in order for the system to insert their signature.

On the Arbitration Agreement itself, right above the signature block, it plainly states: "MY SIGNATURE BELOW ATTESTS TO THE FACT THAT I HAVE READ, UNDERSTAND,

7

AND AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS." Hoyos electronically signed the Arbitration Agreement on November 5, 2020. According to the electronic records summary, Hoyos viewed and electronically signed the Arbitration Agreement at 10:03 p.m. on November 5, 2020.

An electronic signature is binding in Texas. *Aerotek*, 624 S.W.3d at 207–08. We have held that a "signature, electronic or otherwise, is generally deemed to be sufficient to show assent to an arbitration agreement." *Alorica v. Tovar*, 569 S.W.3d 736, 740 (Tex. App.—El Paso 2018, no pet.). We also have previously declined to hold a corporation's electronic records showing the purported log-in and viewing of a document by an employee conclusively established sufficient notice *in light of* the employee's sworn statements that she never saw the Arbitration Agreement at issue. *Kmart Stores of Texas, L.L.C. v. Ramirez*, 510 S.W.3d 559, 570 n.6 (Tex. App.—El Paso 2016, pet. denied).

Here, there is no sworn statement by Hoyos, Mendoza, or anyone, alleging Hoyos did not sign the Arbitration Agreement. We find no evidence in the record that undermines the enforceability of Hoyos's electronic signature. Rather, Mendoza focuses on the sufficiency of safety procedures of Rush's electronic onboarding process, alleges Hoyos did not personally sign the Arbitration Agreement because Rush employees did not directly observe Hoyos complete the onboarding process. Additionally, Mendoza asserts the system neither identifies the applicable time zone and location where the recorded event occurred, nor identifies the specific computer Hoyos used to sign the document. However, these assertions by Mendoza do not create a fact issue as to the validity of the Arbitration Agreement. *See Aerotek*, 624 S.W.3d at 208 ("[W]e cannot agree with the dissent's suggestion that merely denying an electronic signature qualifies as some

8

evidence in showing an electronically signed arbitration agreement's invalidity."). We find Mendoza's allegations fail to show Rush's onboarding process lacked integrity or effectiveness.

As the party resisting arbitration, Mendoza has the burden to provide evidence to uphold a favorable ruling on appeal. *Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105, 132 (Tex. App.—El Paso 2018, no pet.). Here, Mendoza has not provided any evidence supporting a claim Hoyos did not electronically sign the Arbitration Agreement, or the email address or computer he used did not belong to him. Further, Mendoza has not produced evidence the computer he used was inaccessible to him, or he could not read, or could not read English.

As we have recognized before, a party, such as Rush, "is not required to produce evidence to establish the genuine nature of a signature on an arbitration agreement in the absence of a sworn challenge to the signature." *Wright v. Hernandez*, 469 S.W.3d 744, 752 (Tex. App.—El Paso 2015, no pet.). There is no dispute Hoyos continued working after signing the Arbitration Agreement on November 5, 2020. Texas law has long recognized an employee can be bound to arbitration if the employee received electronic notice of an arbitration agreement and continued working thereafter. *See Firstlight*, 478 S.W.3d at 168–71; *see also In re Halliburton Co.*, 80 S.W.3d 566, 568–69 (Tex. 2002) (orig. proceeding) (when employee reported to work after being notified of the arbitration agreement, he accepted the offer, and the employer and employee became bound to arbitrate any disputes); *see also In re Dillard Dep't Stores, Inc.*, 198 S.W.3d 778, 780 (Tex. 2006) (orig. proceeding) (per curiam) (at-will employee received notice of the modified employment terms requiring arbitration and then continued working, and thus accepted those terms as a matter of law, despite lack of any evidence that the employee signed the acknowledgment form).

Under the framework of the Act, Mendoza was tasked with undermining the authenticity of the Arbitration Agreement by presenting evidence of fraud or lack of reliability. *See Solcius*,

2023 WL 2261414, at *4. Mendoza failed to do so. We find Rush has established the efficacy of the security procedures utilized in the transaction and the electronic signature is attributable to Hoyos. We must therefore enforce the Arbitration Agreement. *See id.*

## B. Scope of the Arbitration Agreement

### (1) Mendoza's claims

Mendoza maintains her claims are independent, nonderivative causes of action under Article 16, § 26 of the Texas Constitution and § 408.001 of the Texas Labor Code, and fall outside the scope of the Arbitration Agreement. We proceed to the question whether Mendoza's claims fall within the scope of the Arbitration Agreement given she has pled only under Article 16, § 26 of the Texas Constitution and § 408.001 of the Texas Labor Code.

### (a) Article 16, § 26

Article 16, § 26 of the Texas Constitution, as amended, provides, "Every person, corporation, or company, that may commit a homicide, through willful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body[.]" TEX. CONST. art. 16, § 26. The Texas Supreme Court explained,

> With a statutory cause of action for compensatory damages *already in place*, the constitution was amended to allow for punitive damages in favor of the wrongful death beneficiaries. The question soon arose whether this amendment . . . granted a punitive recovery independent of compensatory relief. As soon as it arose, the question was answered in the negative.

*Travelers Indem. Co. of Illinois v. Fuller*, 892 S.W.2d 848, 851 (Tex. 1995).

The Texas Supreme Court further explained the purpose of Article 16, § 26 was to "*expressly* resolve common law and statutory ambiguity." *Fuller*, 892 S.W.2d at 852. "It did not abrogate the common law requirement of actual damages and extend the remedy to those with no cause of action under the Act." *Id.* The Eastland Court of Appeals has explained:

10

History makes clear that Section 26 was adopted to resolve ambiguities existing in the statutory and common law of punitive damages. When wrongful death statutes were first adopted, the question arose: Did the statute create a new cause of action in the heirs of the deceased or did it simply transmit the decedent's right to sue? Shortly after Section 26 was adopted, Texas Courts held that it was the latter, finding that Section 26 did not grant a punitive recovery independent of a recognized claim for compensatory relief. Consequently, Section 26 does not abrogate the common-law requirement of actual damages or extend a right to seek punitive damages to those with no cause of action under the Wrongful Death Act.

*Garrett v. Patterson-UTI Drilling Co., L.P.*, 299 S.W.3d 911, 916 (Tex. App.—Eastland 2009, pet. denied).

### (b)   Section 48.001

Section 408.001 of the Texas Labor Code provides:

(a) Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.

(b) This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.

(c) In this section, "gross negligence" has the meaning assigned by Section 41.001, Civil Practice and Remedies Code.

TEX. LAB. CODE ANN. § 408.001. Therefore, an employee who receives workers' compensation benefits cannot bring a lawsuit against the employer for actual damages arising out of the incident which caused him injury. *See id.* § 408.001(a); *see also Wagner v. FedEx Freight, Inc.*, 315 F.Supp.3d 916, 920 (N.D. Tex. 2018) ("[A]n employee who is injured or killed on the job and is covered by workers' compensation insurance cannot seek recovery from an employer other than through the remedies and procedures provided by the TWCA."). However, when an employee's on the job death was caused by an intentional act or omission of the employer or by the employer's

11

gross negligence, exemplary damages may be recovered. *See* TEX. LAB. CODE ANN. § 408.001(b).

As the Fourteenth Court of Appeals explained,

> section 408.001(a) explains what the Workers' Compensation Act does—i.e., it provides an exclusive remedy for covered employees and their beneficiaries, substituting the right to statutory benefits for the right to recover actual damages from the worker's employer—and section 408.001(b) explains what the Act does not do—i.e., it does not prohibit certain of a covered employee's survivors from recovering exemplary damages from an employer who caused the employee's death through its intentional act or omission or its gross negligence. Compare *id*. § 408.001(a) with *id*. § 408.001(b). The text of section 408.001(b) is unambiguous, and reading the statute in accordance with its plain language would not produce absurd results. We therefore conclude that section 408.001(b) of the Workers' Compensation Act does not create a nonderivative cause of action for exemplary damages independent of the Wrongful Death Act.

*See Ross v. Union Carbide Corp.*, 296 S.W.3d 206, 214 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (en banc).

### (c) Texas Precedent on § 48.001(b) and Article 16, § 26

The Fourteenth Court of Appeals has specifically found "a claim for exemplary damages under article XVI, section 26 is a derivative cause of action[.]" *Id.* at 213. In *Ross*, the employee developed an asbestos-related disease from workplace exposure prompting him and his wife to sue several asbestos manufacturers under theories of strict liability, negligence, gross negligence, intentional conduct, and breach of warranty. *Id*. at 209. The employee and his wife ultimately signed a release agreement, which settled their claims and barred future claims against the manufactures and his employer. *Id.* at 209–211. The employee died two years later. *Id.* His wife and children, appellants, brought an exemplary damages claim against the employer, alleging the employee's death was caused by the employer's willful act, omission, or gross neglect in exposing him to workplace asbestos. *Id.* at 211. The claim was brought pursuant to Article 16, § 26 of the Texas Constitution and the Workers' Compensation Act—specifically § 408.001(b) of the Texas Labor Code. *Id.* The employer moved for summary judgment relying on the affirmative defense

of release, which the trial court granted. *Id.* The appellants argued the employee could not have "validly assigned, settled, or released their claims arising from [employee's] death." *Id.* The court held the release executed by the employee and his wife "broadly cover[ed] all claims and damages against [the employer], including those under the Wrongful Death Act. Thus, the Release bars appellants' claims unless the claims are properly asserted on some basis other than the Wrongful Death Act." *Id.* at 212.

In *Ross*, appellants argued their claims were not brought pursuant to the Wrongful Death Act, but "instead contend[ed] that specific provisions of the Texas Constitution and the Workers' Compensation Act, alone or in combination, create an exemplary-damages cause of action that is both independent of the Wrongful Death Act and nonderivative of [employee's] rights." *Id.* Appellants argued, among other things, that the employee could not release his survivors' exemplary-damages claim under Article 16, § 26 of the Texas Constitution and § 408.001(b). *Id.* at 213.

To answer this question, the Fourteenth Court of Appeals first analyzed whether the claim was an independent exemplary-damages claim under the TWCA. *Id.* They determined it was not. *Id.* According to the court, its analysis was "made easier because our highest court already has analyzed and explained, in a unanimous decision, this section's purpose:"

> [T]he reason for adoption of the constitutional provision was to allow for exemplary damages under the Wrongful Death Act because of an early interpretation that such damages were not authorized by the Act . . . . It did not abrogate the common law requirement of actual damages and extend the remedy to those with no cause of action under the [Wrongful Death] Act.

*Id.* (quoting *Fuller*, 892 S.W.2d at 851–52). The court then, relying on *Fuller*, held a claim for exemplary damages under Article 16, § 26 of the Texas Constitution is "asserted through the Wrongful Death Act, not separately from it." *Id.* ("Thus, *Fuller* makes clear that a claim for

13

exemplary damages under article XVI, section 26 is asserted through the Wrongful Death Act, not separately from it."). In turn, the court found an employee's "'pre-death contract may limit or totally bar a subsequent action' by his wrongful-death beneficiaries." *Id.* Accordingly, the court held because the release broadly discharged the employer from liability, which included liability for exemplary damages and wrongful death, "and a claim for exemplary damages under article XVI, section 26 is a derivative cause of action that may be asserted only through the Wrongful Death Act, appellants' claim for exemplary damages under the Texas Constitution is barred by the Release." *Id*. The court also concluded "section 408.001(b) of the Workers' Compensation Act does not purport to create an independent cause of action, but instead identifies an exception to the Act's exclusivity provision." *Ross*, 296 S.W.3d at 214. We agree. We, too, have previously held that § 408.001(b) is not an independent cause of action. *See Hudspeth Cnty. v. Ramirez*, 657 S.W.3d 103, 110–11 (Tex. App.—El Paso 2022, no pet.).

In *Hudspeth*, we held § 408.001 of the Texas Labor Code is not an independent cause of action. *Id*. at 110–11. There, the decedent, who was an employee of the Hudspeth County Sheriff's Office, died following an on-the-job injury. *Id*. at 106–07. Appellee, individually and as a representative of the decedent's estate, filed suit against Appellants, Hudspeth County and the Hudspeth County Sheriff's Office, for wrongful death under the Wrongful Death Act seeking exemplary damages for gross negligence. *Id.* at 107. Appellee later included an additional claim under the Workers' Compensation Act, and an alternative claim under the Tort Claims Act. *Id.* Appellants filed a plea to the jurisdiction, which was granted. *Id.* The crux of the issue on appeal was whether Appellants retained governmental immunity. *Id*. Appellants argued they could not be liable under § 408.001(b) of the Texas Labor Code. *Id*. Appellee maintained she was not bringing a cause of action under the Tort Claims Act, but rather, under § 408.001(b) of the Texas Labor

14

Code. *Id*. We found appellee's claim for exemplary damages under § 408.001(b) of the Texas Labor Code had no jurisdictional basis for two reasons, one of which is relevant to the current analysis at hand; we held § 408.001(b) "is neither an independent cause of action nor a waiver of governmental immunity." *Id*. at 110–11.

The U.S. District Court for the Northern District of Texas has agreed, providing that § 408.001(b) "does not confer an independent cause of action for exemplary damages upon a plaintiff," but rather, "preserves a tort claim that arises elsewhere." *Wagner*, 315 F.Supp.3d at 921. In *Wagner*, plaintiffs brought a gross negligence suit seeking exemplary damages against their father's employer, FedEx. *Id*. at 918. FedEx removed the case to the Northern District of Texas asserting federal jurisdiction. *See* 28 U.S.C. §§ 1332, 1441. In response, plaintiffs filed a motion to remand, claiming the action was not removeable because their claim for gross negligence arises under the TWCA, specifically under § 408.001(b) of the Texas Labor Code. *Wagner*, 315 F.Supp.3d at 918. FedEx maintained § 408.001(b) does not create an independent cause of action for gross negligence, but instead, preserves a preexisting cause of action under the Texas Wrongful Death Act. *Id*. at 919. Thus, FedEx maintained the gross negligence claim does not arise under the TWCA and was properly removable. *Id*. According to plaintiffs, however, § 408.001(b) creates a cause of action for exemplary damages and therefore "arises under" the TWCA and is not removeable. *Id*.

The Northern District of Texas found the "plain language" of § 408.001(b) and the "most natural reading of the statute" suggests that a right to sue for exemplary damages for wrongful death already exists; § 408.001(b) merely "preserves a tort claim that arises elsewhere." *Id*. at 921. The court conducted a historical examination of the Texas Constitution, the Texas Wrongful Death Act, and the TWCA in reaching its conclusion, which we find is instructive. *Id*. at 922.

15

By the enactment of the Wrongful Death Act in 1860, a deceased employee's spouse or heirs could sue, for the very first time, an employer for damages resulting from an on-the-job death. *Id*. Following the enactment, a division of authority resulted as to whether exemplary damages were recoverable under the Wrongful Death Act. *Id*. (citing *Fuller*, 892 S.W.2d at 850). Article 16, § 26 of the Texas Constitution resolved the split in authority and was amended to make exemplary damages recoverable. *Id*. Then, in 1913, the Texas legislature enacted the TWCA, which provided the exclusive remedy for an employee's on-the-job injury, except for claims of gross negligence by a deceased employee's spouse and heirs, which the Texas Constitution expressly recognizes, and which existed prior to the passage of the TWCA. *Id*. (citing *Trinity Cnty. Lumber Co. v. Ocean Accident & Guar. Corp., Ltd.*, 228 S.W. 114, 117–18 (Tex. [Comm'n Op.] 1921) ("It is thus apparent that the [TWCA] does not impose liability for exemplary damages. It does not alter in this respect the liability of the employer prior to the passage of the [TWCA]. It neither adds to nor takes from such liability, but leaves the law with reference thereto as it stood before the passage of the act and subject to the same defenses" (emphasis added).). Thus, the historical setting of these provisions support that § 408.001(b) does not create an independent cause of action for gross negligence. The court also analyzed the purpose of the TWCA and its statutory structure in further support of this conclusion, which we find particularly persuasive. *See id*. at 924. The purpose of the TWCA is to "expediently resolve an injured employee's claim" without the "burden of proving their employer's negligence . . . and in exchange, an employee is prohibited from seeking common-law remedies from his employer, including an action for gross negligence resulting in his or her death." *Id*. at 924–25 (quoting *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 206–07 (Tex. 2000)) (internal quotation marks omitted). The TWCA provides an "extensive, regulatory framework" for resolving the claims of injured workers, which "stands in stark contrast" to

16

§ 408.001(b)'s "simple provision that it does not prohibit the recovery of exemplary damages." *Id*. at 924 (citing *Gomez v. O'Reilly Auto Stores, Inc.*, 283 F.Supp.3d 569, 573 (W.D. Tex. 2018)). This difference, "indicates that a party must look outside the TWCA's statutory framework for determining the elements of proof necessary to recover for an employer's gross negligence." *Id*. at 924 According to the court, § 408.001(b) "does not advance the purpose of the TWCA—to expediently resolve an injured employee's claims." *Id*. at 925. We agree. § 408.001(b) provides a remedy to surviving spouses and heirs, and merely states it does not *prohibit* the recovery of exemplary damages for the gross negligence of an employer, "consistent with the Texas Constitution's mandate and pre-existing wrongful death legislation." *Id*.

We recognize, however, that Texas appellate courts have concluded the contrary—the recovery of exemplary damages for an employer's gross negligence provides an independent cause of action. *See Zacharie v. U.S. Natural Resources, Inc.*, 94 S.W.3d 748 (Tex. App.—San Antonio 2002, no pet.); *see also Smith v. Atlantic Richfield Co.*, 927 S.W.2d 85 (Tex. App.—Houston [1st Dist.] 1996, writ denied). In *Zacharie*, Martha Zacharie was exposed to toxic airborne substances from her workplace. *Id*. at 751. Martha filed suit against her employer one day before the statute of limitations expired, alleging negligence and seeking actual and exemplary damages. *Id*. That same day, her attorney requested citations be issued by private process; the citations were issued, but were never served. *Id*. Martha died a few months after and her daughters subsequently joined the lawsuit and amended the original petition to include a cause of action under the TWCA and the Texas Survival Statute, along with a claim of gross negligence. *Id*. The employer moved for summary judgement, which was granted. *Id*. The court directly addressed whether the Zacharie children had an independent, nonderivative cause of action under Article 16, § 26 and § 408.001 for gross negligence and exemplary damages. *Id*. at 756. The Fourth Court of Appeals, in

17

acknowledging the Texas Supreme Court has not addressed this issue directly, relied on its own precedent and that of the Fourteenth Court of Appeals in holding "the TWCA, in conjunction with Article 16, Section 26 of the Texas Constitution expressly allows a surviving spouse or child to bring an independent claim for exemplary damages against an employer for gross negligence that resulted in an employee's death." *Id*. (citing *Perez v. Todd Shipyards Corp.*, 999 S.W.2d 31, 33 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), *Smith v. Atl. Richfield Co.*, 927 S.W.2d 85, 87 (Tex. App.—Houston [1st Dist.] 1996, writ denied)).

However, we must note that in *Ross*, the Fourteenth Court of Appeals expressly overruled its prior decision, admitting that *Perez* does not accurately represent the settled law; "the reasoning in *Perez* cannot be reconciled with that of the . . . decisions of the Texas Supreme Court." *Ross*, 296 S.W.3d at 214–15 (citing *Fuller*, 892 S.W.2d at 851–52; *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345–47 (Tex. 1992); *Sullivan–Sanford Lumber Co. v. Watson*, 155 S.W. 179, 180 (Tex. 1913); *Thompson v. Fort Worth & R.G. Ry. Co.*, 80 S.W. 990, 992 (Tex. 1904)). *Zacharie* also relies on *Smith* out of the First Court of Appeals. *Smith*, 927 S.W.2d at 87.

There is no interplay of the TWCA in *Smith*, but there, the First Court of Appeals concluded that reliance on *Fuller*—for the proposition that gross negligence claims are derivative and not an independent cause of action—is misplaced because the plaintiff in *Fuller* was attempting to recover exemplary damages from an *insurance company* rather than the *employer*. *Id*. at 87–88. In *Smith*, the court considered whether the family's claim was still viable because the decedent himself could not have sued for injuries had he survived due to the exclusive remedy for workers' compensation benefits. *Id*. at 87. The First Court of Appeals reasoned that the former TWCA "specifically provided for exemplary damages in wrongful death cases brought against *employers* where gross negligence is proved . . . [and] [n]o such express provision is made for cases against

18

insurers." *Id.* at 88. On this basis, the court in *Zacharie* held the Zacharie children had a viable cause of action, and their rights were not derivative. *Zacharie*, 94 S.W.3d at 758.

As to the distinction of a cause of action for exemplary damages for gross negligence against an employer as opposed to an insurance company, the Fourteenth Court of Appeals in *Ross* recognized, "[t]his argument, however, appears to have been a red herring, for the *Smith* opinion contains no indication the family pursued its claim under the Texas Constitution rather than the Wrongful Death Act." *Ross*, 296 S.W.3d at 225 n.7. We agree.

We recognize we are departing from the opinion of the First Court of Appeals and some federal courts. *See, e.g.*, *Zacharie*, 94 S.W.3d at 758; *Smith*, 927 S.W.2d at 87–88*; see also Sbrusch v. Dow Chemical Co.*, 124 F.Supp.2d 1090, 1092 (S.D. Tex. 2000); *Johnson v. City of Houston*, No. H-12-2786, 2013 WL 789075, at *2–3 (S.D. Tex. Mar. 1, 2013) (mem. op.). However, notwithstanding this contrary Texas authority, the historical setting in which the provisions were enacted, along with the purpose of the TWCA and its statutory structure, and the plain language of § 408.001(b), lead us to conclude that neither Article 16, § 26 of the Texas Constitution, nor § 408.001(b) of the Texas Labor Code, alone or in conjunction, create an independent cause of action for the recovery of exemplary damages for an employer's gross negligence. *See Hudspeth*, 657 S.W.3d at 107–11; *see also Fuller*, 892 S.W.2d at 852; *Ross*, 296 S.W.3d at 212–17; *Wagner*, 315 F.Supp.3d at 920–31.

**(2)   Whether Mendoza's claims are subject to the Arbitration Agreement**

Having found that neither Article 16, § 26, nor § 408.001(b), alone or in conjunction, create an independent cause of action, we now turn to whether Mendoza's claims are subject to the Arbitration Agreement. Mendoza asserts her gross negligence claim arises under the TWCA and the Arbitration Agreement's language excludes such workers' compensation benefits from its

19

scope. In addition, and in the alternative, Mendoza claims the Arbitration Agreement is, at best, ambiguous, and should be construed against Rush. Mendoza specifically maintains the plain language of the Arbitration Agreement creates an ambiguity as to which type of workers' compensation claims are excluded. We disagree. For the following reasons, we find Mendoza's gross negligence claim is subject to the Arbitration Agreement, while Mendoza's claim for workers' compensation is not.

The provision in the Arbitration Agreement at issue provides:

> Both I and the Company agree that any claim, dispute, and/or controversy that I may have against the Company . . . , or the Company may have against me, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("FAA"). Included within the scope of this agreement (the "Agreement") are all disputes, whether based on tort, negligence, contract, statute (including, but not limited to, any claims of discrimination, harassment and/or retaliation, whether they be based on Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation), equitable law, or otherwise. *The only exceptions to binding arbitration shall be for* claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, *claims for workers' compensation benefits, (medical and disability), unemployment compensation benefits,* or other claims that are not subject to arbitration under current law (emphasis added).

Mendoza's live petition reads, in pertinent part:

> This gross negligence lawsuit and Workers Compensation lawsuit against Defendants for the death of Marco A. Hoyos Martinez by Decedent's legal beneficiary surviving spouse Rosario Y. Mendoza is brought under the Texas Workers Compensation Laws of the State of Texas pursuant to § 408 of the Texas Labor Code, Article 1, Section 13 and Article 16 Section 26 of the Texas Constitution, among other laws.

### (a) Gross negligence claim

Mendoza premises her gross negligence claim on Rush's non-delegable duty to provide a safe workplace to its employees and cites § 411.103 of the Texas Labor Code throughout her petition. *See* TEX. LAB. CODE ANN. § 411.103. Mendoza claims her gross negligence claim arises

under the TWCA for workers' compensation benefits, and as such, the Arbitration Agreement's language excludes such workers' compensation benefits from its scope. However, although we ultimately agree the workers' compensation claim is excluded from the Arbitration Agreement, we find Mendoza's assertions as to her gross negligence claims misguided.

In answering whether the gross negligence claim is subject to the Arbitration Agreement, we first address the interplay of the TWCA. The TWCA establishes the exclusive remedy for non-intentional, work-related injuries and provides an employee covered by workers' compensation insurance, or his legal beneficiary, may only recover benefits for work-related injuries. TEX. LAB. CODE ANN. § 408.001(a). Under the Texas Constitution, however, an employer that commits a homicide, through willful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving spouse. TEX. CONST. art. 16, § 26. Following the Texas Constitution's mandate, the TWCA "does not prohibit" the recovery of exemplary damages by the surviving spouse of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence. TEX. LAB. CODE ANN. § 408.001(b). *See Wagner*, 315 F.Supp.3d at 923 ("Essentially, despite restricting the method and manner in which an employee could recover damages for an on-the-job injury, the TWCA did not preclude a deceased employee's spouse and heirs from pursuing an exemplary damages claim—*a cause of action that existed prior to the passage of the TWCA*—because the Texas Constitution expressly recognizes such a right to recover damages" (emphasis added).).

The arbitration agreement recognizes these two pathways—workers' compensation benefits for non-intentional, work-related injuries by way of the TWCA's statutory framework, and claims wherein exemplary damages may be recovered by surviving spouses and heirs for an employer's gross negligence. Workers' compensation claims are processed under the statutory,

21

administrative procedure on a no-fault basis and are specifically excluded from the arbitration process under the agreement's plain language, while other tort claims, such as Mendoza's gross negligence claim, are subject to arbitration.[3] *See Wagner*, 315 F.Supp.3d at 924 ("the TWCA outlines complex administrative procedures for resolving injured workers' claims, e.g., defining the types of benefits and computation for such benefits, detailing the procedures an employee must follow to file a claim, and detailing an administrative process for adjudicating disputes").

The language of § 408.001(b) does not create, but merely preserves a preexisting cause of action for gross negligence "because the Texas Constitution requires it." *Wagner*, 315 F.Supp.3d at 924 (quoting *Bridges v. Phillips Petroleum Co.*, 733 F.2d 1153, 1154 (5th Cir. 1984) (per curiam) ("[T]he [Texas] legislature in section 5 [§ 408.001(b)'s predecessor] of the statute expressly exempted exemplary damages from the purview of the [TWCA] because the Texas Constitution requires it" (internal quotation marks omitted)); *see* TEX. LAB. CODE ANN. § 408.001(b). Section 408.001(b) specifically provides it "*does not prohibit* the recovery of exemplary damages by the surviving spouse" of a deceased employee whose death was caused by the employer's intentional act, omission, or gross negligence. TEX. LAB. CODE ANN. § 408.001(b) (emphasis added). It serves to *except* a preexisting remedy mandated by the Texas Constitution for the recovery of exemplary damages for an employer's gross negligence. *See Mo-Vac Serv. Co., Inc. v. Escobedo*, 603 S.W.3d 119, 137 n.7 (Tex. 2020) ("Section 408.001(b) of the Act excepts from its exclusive remedy an action for 'recovery of exemplary damages by the surviving spouse

---

[3] Additionally, Mendoza has asserted claims against Rush under authority granted in the Texas Constitution, as preserved in the Texas Labor Code by way of § 408.001(b), claiming Rush's alleged gross negligence caused Hoyos's fatal work injury. *See* TEX. CONST. art. XVI, § 26; TEX. LAB. CODE ANN. § 408.001(b). Mendoza would not be awarded workers' compensation benefits under the TWCA by way of her gross negligence claim; rather, she would be entitled to exemplary damages under a tort theory of negligence. *See* TEX. CONST. art. XVI, § 26; TEX. LAB. CODE ANN. § 408.001(b).

or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.'").

Despite Mendoza's pleadings, she can neither convert a TWCA-remedies-preservation clause nor a constitutional-remedies provision into an independent cause of action to except it from mandatory arbitration on the basis of a "claims for workers' compensation benefits, (medical and disability)" exception in the Arbitration Agreement. *See Wagner*, 315 F.Supp.3d at 921 ("The most natural reading of the statute is that § 408.001(b) assumes a right to sue for wrongful death already exists—i.e., it does not confer an independent cause of action for exemplary damages upon a plaintiff, but instead preserves a tort claim that arises elsewhere."); *Ross*, 296 S.W.3d at 217 ("[N]either article XVI, section 26 of the Texas Constitution nor section 408.001(b) of the Workers' Compensation Act, alone or in conjunction with one another, creates a nonderivative cause of action that may be asserted independently from the Wrongful Death Act."). Because claims under the Wrongful Death Act are derivative of the injured person's claim and Hoyos agreed to arbitrate all disputes except TWCA claims, Mendoza's gross negligence claim thus falls within the scope of the Arbitration Agreement.[4]

### (b) Workers' compensation claim

In contrast, Mendoza's claim for workers' compensation benefits under the TWCA is excluded from the Arbitration Agreement. Mendoza is currently receiving workers' compensation benefits under the statutory framework of the TWCA. Under the TWCA's no-fault statutory framework, employees are relieved of the burden of proving their employer's negligence, and it

---

[4] As to Mendoza's assertion that the Arbitration Agreement is at best, ambiguous, we disagree. The arbitration agreement expressly states, "within the scope of this agreement . . . are all disputes, whether based on tort, [or] negligence . . . ." Because we conclude Mendoza's gross negligence claim is a derivative claim that does not arise under the TWCA, it is thus a "dispute . . . based on tort" and is subject to arbitration.

provides timely compensation for work-related injuries. *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 142 (Tex. 2003); *Wagner*, 315 F.Supp.3d at 924 (citing *Alvarado*, 111 S.W.3d at 142) ("The Texas legislature enacted the TWCA to expediently resolve injured workers' claims.").

We therefore find, a claim for workers' compensation benefits, including an alleged surviving spouse's claim for death benefits under the TWCA, such as Mendoza's, is a separate and distinct right to benefits dictated by the administrative framework of the statute. *See Wagner*, 315 F.Supp.3d at 924 ("Under the TWCA, employees are relieved 'of the burden of proving their employer's negligence,' and in exchange, an employee is prohibited 'from seeking common-law remedies from his employer,' including an action for gross negligence resulting in his or her death."); *see also* TEX. LAB. CODE ANN. §§ 408.001–.222 (workers' compensation benefits), 409.001–.024 (compensation procedures), 410.002–.308 (adjudication of disputes); 410.002 ("A proceeding before the division to determine the liability of an insurance carrier for compensation for an injury or death under this subtitle is governed by this chapter."); § 410.104 ("If issues remain unresolved after a benefit review conference, the parties, by agreement, may elect to engage in arbitration in the manner provided by this subchapter. Arbitration may be used only to resolve disputed benefit issues and is an alternative to a contested case hearing."). Because the right to workers' compensation benefits, including death benefits, arises within the TWCA itself, the statutory right to pursue such administrative benefits cannot be altered by contract. As such, Mendoza's workers' compensation claim is not subject to the Arbitration Agreement, but rather, is properly within the statutory framework of the TWCA.[5]

---

[5] On this basis, we need not address Mendoza's contract interpretation and construction argument, wherein she maintains that an ambiguity exists because the phrase "claims for workers' compensation benefits" is separated by a comma from the phrase "(medical and disability)". The portion she refers to reads: "The only exceptions to binding arbitration shall be for . . . *claims for workers' compensation benefits, (medical and disability),* . . . ." Our finding that the workers' compensation claim for benefits is a separate and distinct right to benefits dictated by the administrative

In conclusion, we find Mendoza's gross negligence claim is subject to the Arbitration Agreement, and Mendoza's claim for workers' compensation benefits is excluded from the Arbitration Agreement.

### (3) Mendoza is bound to the Arbitration Agreement as a non-signatory

Mendoza further attempts to argue her claims fall outside the scope of the Arbitration Agreement because she cannot be bound to its terms as a non-signatory. Rush insists Mendoza's claims are dependent and derivative of Hoyos's rights, and because Hoyos signed a valid arbitration agreement, Mendoza's claims are bound by that agreement. We agree.

The Texas Supreme Court has held under Texas law, a decedent's pre-death arbitration agreement binds his or her wrongful death beneficiaries because the wrongful death cause of action is entirely derivative of Hoyos's rights. *In re Labatt Food Service, L.P.*, 279 S.W.3d 640, 644–45 (Tex. 2009). In *Labatt,* the Court concluded an arbitration agreement between an employee and his employer, signed before the employee's death and requiring arbitration pursuant to the Federal Arbitration Act (FAA), requires the employee's wrongful death beneficiaries to arbitrate their wrongful death claims against the employer, even as non-signatories. *Id.* at 645–47. The Court reasoned that although the beneficiaries were seeking compensation for their own personal loss, they still stood in the decedent's legal shoes and were thus bound by the arbitration agreement. *Id.* at 644 ("[I]t is well established that statutory wrongful death beneficiaries' claims place them in the exact 'legal shoes' of the decedent, and they are subject to the same defenses to which the decedent's claims would have been subject."). The Court has consistently held the right of statutory beneficiaries in a wrongful death action is "entirely derivative of the decedent's right to

---

framework of the TWCA and is expressly excluded from the Arbitration Agreement, is dispositive of her contract interpretation and construction argument.

have sued for his own injuries immediately prior to his death." *Id*. Similarly, we find Mendoza's claims are inherently derivative of Hoyos's rights. *See id.*

Furthermore, the Court held this includes enforcing binding arbitration agreements. *Id.* at 646 (rejecting beneficiaries' argument that agreements to arbitrate are different than other contracts, and they should not be bound by decedent's agreement, finding "[n]ot only would this be an anomalous result, we believe it would violate the FAA's express requirement that states place arbitration contracts on equal footing with other contracts."); *In re Golden Peanut Co., LLC*, 298 S.W.3d 629, 631 (Tex. 2009) (holding decedent's wrongful death beneficiaries were derivative claimants and as such, were bound by employee's agreement to arbitrate although they had not signed the arbitration agreement). The Court explained,

> If [employee] had sued for his own injuries immediately before his death, he would have been bound to submit his claims to arbitration. As derivative claimants under the wrongful death statute his beneficiaries are bound as well, . . . and the trial court clearly abused its discretion by refusing to compel arbitration (internal citations omitted).

*Id*. Similarly, because we have found Mendoza's claims are derivative and dependent on Hoyos's rights, and because Hoyos signed a valid and enforceable arbitration agreement, we find Mendoza's claims are bound by that agreement.

## C. Waiver of right to arbitration

Mendoza maintains the trial court did not err in denying Rush's motion to stay proceedings and compel arbitration because Rush waived its right to submit her gross negligence claim to arbitration, or, in the alternative, quasi-estoppel estops Rush from submitting the gross negligence claim to arbitration. According to Mendoza, Rush waived its right to compel arbitration as to the gross negligence claim because after Hoyos's death, Rush "proactively submitted a workers' compensation claim for death benefits for this work-related death" and accordingly, "[t]his tactic

26

of filing with the TWCC unequivocally establishes that Appellant elected to protect itself outside of arbitration because it stood to benefit from such decision." In other words, Mendoza argues because Rush chose to submit a workers' compensation claim under the TWCA rather than arbitration, therefore, Rush has waived its right to arbitrate the gross negligence claim, or in the alternative, should be estopped from submitting such claim to arbitration.

As discussed above, Mendoza's claim for workers' compensation benefits because of her husband's work-related fatal injury, was correctly submitted under the no-fault, administrative system created by statute. As established, Mendoza's claims for workers' compensation benefits arise out of, and are subject to, the TWCA. If Rush submitted Mendoza's claim for workers' compensation benefits under the no-fault, administrative framework of the TWCA, Rush did not waive its rights under the Arbitration Agreement as to Mendoza's gross negligence suit, which arises separate from and outside the TWCA.

There was no "election of remedies" as Mendoza suggests. Our reading of the Arbitration Agreement carves out workers' compensation benefits while tort claims are expressly subject to it. Accordingly, Rush did not waive its right to compel arbitration as to Mendoza's gross negligence claim by statutorily proceeding with the no-fault, administrative system of the TWCA for Mendoza's workers' compensation benefits based on Hoyos' work-related injury. *See In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 763 (Tex. 2006) (per curiam) (recognizing "a strong presumption against waiver under the FAA").

### D. The FAA's § 1 interstate commerce exception

Mendoza further asserts the trial court's denial of the motion to stay proceedings and compel arbitration should be affirmed because Hoyos belongs to a class of workers engaged in interstate commerce, thus exempting him from the FAA's coverage. If true, Mendoza standing in

27

Hoyos's legal shoes, would be exempt from the FAA and instead be subject to the Texas Arbitration Act (TAA). *See Forged Components, Inc. v. Guzman*, 409 S.W.3d 91, 97 (Tex. App.— Houston [1st Dist.] 2013) (citing Tex. Civ. Prac. & Rem. Code Ann. § 171.002(a)(3), (c)(2)). We begin by determining whether Hoyos falls within a "class of workers engaged in foreign or interstate commerce" which would exempt him from the FAA's coverage. 9 U.S.C. § 1.

The FAA governs arbitration agreements in instances where the agreement governs "a transaction involving commerce." 9 U.S.C. § 2. However, § 1 of the FAA excludes "contracts of employment of seamen, railroad employees, o*r any other class of workers engaged in foreign or interstate commerce*" from its coverage. 9 U.S.C. § 1 (emphasis added). The U.S. Supreme Court has confined this language to exempt "contracts of employment of transportation workers." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001).

As the Court has observed, the FAA speaks of "workers," rather than "employees" or "servants." *Sw. Airlines Co. v. Saxon*, 142 S.Ct. 1783, 1788 (2022). The Court specified the word "workers" directs the interpreter's attention to "the performance of work." *Id.* The word "engaged" similarly emphasizes the actual work that the members of the class, as a whole, typically carry out; a worker is therefore a member of a "class of workers" based on what he or she does at the company, rather than what the company does generally. *Id.* ("Saxon [the worker,] is therefore a member of a 'class of workers' based on what she does at Southwest, not what Southwest does generally.").

Those subject to the exemption "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 1790 (quoting *Circuit City Stores, Inc.*, 532 U.S. at 121 (2001)). Stated differently, to qualify as a transportation worker, one must be personally, "actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate

28

commerce." *Id*. The focus is on what *actual* work is performed by the worker, rather than what the company does generally. *Id.* at 1788. Accordingly, we must determine whether Hoyos was a transportation worker within the meaning assigned by the Court in *Saxon*. *See id.*

Mendoza asserts Rush is an interstate commercial truck dealership and service center which is involved in interstate commerce. Therefore, it follows, Hoyos, as a Body Shop Technician Level II, sold and serviced commercial motor vehicles and parts used in interstate commerce, rendering him a worker engaged in interstate commerce. According to Mendoza, Hoyos "played a necessary role in keeping the commercial trucks on the interstate for the free flow of goods in interstate commerce, which mandates commercial motor vehicle transport on the public highways." Further, Rush expected Hoyos "to repair and service commercial motor vehicles quickly to get such commercial vehicles back on the public interstate highways."

According to Jacob Madrid, the general manager of Rush Truck Center-El Paso, at the time of his death, Hoyos was a Body Shop Technician Level II (BS-II). This position was a level two out of five possible levels. As a BS-II, Hoyos's primary duties consisted of preparing vehicles and work areas for body detailing, repairs, and cleanup. This mostly required taping, sanding vehicles, removing badging and decals, and conducting minor body detailing, such as bumper repairs and paint refreshing. On the day of his death, Hoyos was cleaning a vocational garbage disposal truck with soapy water to prepare it for re-painting. According to Rush, the service department primarily repairs and executes the maintenance of vehicles, while the body shop, which is where Hoyos worked, consisted of "cosmetic and minor body" detailing work that is unrelated to engine or drivetrain function.[6]

---

[6] We note Hoyos executed the onboarding documents on November 5, 2020 for employment as a BS-II, and the fatal incident occurred on November 23, 2020—i.e., the entirety of his employment at issue consisted of the aforementioned duties.

Mendoza cites *Western Dairy Transport*, wherein we previously held a truck mechanic was not a transportation worker exempt from the § 1 exclusion. *Western Dairy Transport, LLC v. Vasquez*, 457 S.W.3d 458, 465 (Tex. App.—El Paso 2014, no pet.). There, we utilized the eight *Lenz* factors established by the U.S. Eighth Circuit. *Lenz v. Yellow Transportation, Inc.*, 431 F.3d 348, 352 (8th Cir. 2005). In *Lenz*, the Eighth Circuit formulated eight nonexclusive factors for determining whether an employee is a transportation worker. *Id.* The *Lenz* factors are as follows: (1) "whether the employee works in the transportation industry"; (2) "whether the employee is directly responsible for transporting the goods in interstate commerce"; (3) "whether the employee handles goods that travel interstate"; (4) "whether the employee supervises employees who are themselves transportation workers, such as truck drivers"; (5) "whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA"; (6) "whether the vehicle itself is vital to the commercial enterprise of the employer"; (7) "whether a strike by the employee would disrupt interstate commerce"; and (8) "the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties." *Id.*

We begin with the first *Lenz* factor and find the record does not support a finding that Rush is in the transportation industry. According to Jacob Madrid, Rush is not a trucking company and does not engage in the transportation of interstate commerce. Rush has the following departments: sales, service, parts, body, and finance. Rush's primary source of revenue is the sale of vehicles and parts. In 2019 and 2020, Rush derived 83% of its revenue from sales, which included parts, and heavy duty and medium duty trucks. The service department and body shop, combined, produced approximately 7% of Rush's total revenue. The body shop, which is where Hoyos

30

worked, produced 4.3% of Rush's total revenue. During the deposition of Sassaman, Rush's business model from its website was discussed:

| | |
|---|---|
| Mendoza's counsel: | And just on the Maintenance and Repair Service, and it says, Full-Service Truck Maintenance and Repair Service. At the very top, At Rush Truck Centers, our goal is to increase your uptime and lower your operating costs, and complete maintenance solutions for all makes and models of commercial vehicles . . . |
| Sassaman: | Yes. |
| Mendoza's counsel: | Okay. And that's what you do, you are involved in what we -- what is known in the trucking industry, under the Federal Motor Carriers Safety Act and the regulations that are defined as commercial motor vehicles, that's what your company deals with. |
| | .   .   . |
| Sassaman: | That is part of our business, yes. |
| Mendoza'a counsel: | And "commercial motor vehicle" means a vehicle over 10,000 pounds, correct? |
| Sassaman: | I believe so, yes. |
| Mendoza'a counsel: | And for you -- for use in interstate transportation and commerce, correct? |
| | .   .   . |
| Sassaman: | It can be used for that, yes. |
| Mendoza's counsel: | And when you say "to increase your uptime and lower your operating costs," this is for the trucking industry, to tell them, when they come to Rush Truck Center, We'll fix your truck if you've got a problem with it and we'll get you back on the road as quickly as we can so that you lose as little time and expense as necessary to fulfill your interstate trucking business or whatever trucking business you are doing, right? |
| | .   .   . |

| | |
|---|---|
| Sassaman: | The goal of our service department is to repair trucks adequately and safely so they can be back on the road as fast as possible. |

Hoyos did not work in the service department; he worked in the body department as a BS-II.

Continuing with the deposition of Sassaman, he was asked:

| | |
|---|---|
| Mendoza's counsel: | Would you say more than -- would you say most of your business is involved in interstate transportation commerce trucking? |
| | .   .   . |
| Sassaman: | No. What I'm saying is: What those -- what the customer uses the vehicle for is a wide variety of services. I can't say for sure, with certainty, that everything is interstate. |
| | .   .   . |
| | Some of our customers that we sell trucks to and service may indeed to interstate travel. But again, percentage-wise and such, I couldn't answer that. |

Notably, the federal district court for the Central District of California concluded a mechanic working on engines and drivetrains of the trucks at a Rush Truck Centers of California-Whittier location, was not a transportation worker. *Fuentes v. Rush Truck Centers of California, Inc.*, No. 18-10446, 2019 WL 3240100, at *4–5 (C.D. Cal. Mar. 11, 2019) ("First, it is undisputed that Plaintiff, who worked as a mechanic at Rush Truck Centers, was not personally responsible for transporting goods. . . . Second, it does not appear that [Rush] engaged in business that was closely proximate to either the transportation industry or the transportation and delivery of goods."). The *Fuentes* court also found that Rush's primary mission is not transporting and moving goods, but rather, selling automobiles. *Id.* at *5. Additionally, the Fifth Court of Appeals in Dallas, in applying *Saxon*, held that because recruiters of truck drivers do not move any goods, and there was no showing that recruiters were necessary for transportation, the FAA's § 1 exclusion did not apply to truck driver recruiters. *Gordon v. Trucking Res. Inc.*, No. 05-21-00746-

CV, 2022 WL 16945913, (Tex. App.—Dallas Nov. 15, 2022, no pet.) (mem. op.). Here, Rush is a network of truck dealerships, and a Texas federal court has confirmed that vehicle dealerships are not in the transportation industry. *See Tran v. Texan Lincoln Mercury, Inc.*, No. H-07-1815, 2007 WL 2471616, at *5–6 (S.D. Tex. Aug. 29, 2007) (mem. op.) (holding dealership was not engaged in "transportation industry" and thus employee was not a "transportation worker" under § 1 of the FAA). Accordingly, the record does not support a finding that Rush is in the transportation industry.

As for whether Hoyos was directly responsible for transporting goods in interstate commerce (second *Lenz* factor), and whether Hoyos handled goods that travel interstate (third *Lenz* factor), we find nothing in the record to show Hoyos ever transported or handled goods in interstate commerce. Hoyos was also not a supervisor (fourth *Lenz* factor). The record also does not support he was not within a class of employees for which special arbitration existed when Congress enacted the FAA (fifth *Lenz* factor). The record does not support or indicate Hoyos ever used or drove a vehicle, at all, as part of his duties (sixth *Lenz* factor). Additionally, the work performed by Hoyos amounted to a minimal percentage of Rush's total annual revenue—4.3%. Moreover, the record does not affirmatively establish Hoyos was involved in engine or drivetrain work, or the trucks Hoyos serviced as a BS-II traveled interstate. Accordingly, a strike by Hoyos and his class of workers, BS-IIs, would likely not disrupt interstate commerce (seventh *Lenz* factor). Lastly, as for the nexus between Hoyos's duties and the vehicles used in carrying out his duties, we emphasize the record does not contain any indicia Hoyos ever used or drove a vehicle as part of his duties, and we defer to our analysis under the *Saxon* framework, wherein we described the nature of Hoyos's work as a BS-II. Hoyos's duties, as described in the record, did not involve engine or drivetrain work, but rather, what was described as "cosmetic and minor body repairs." Applying

33

the *Lenz* factors to a BS-II, as that position is explained in the record before us, we further find that Hoyos was not a worker engaged in interstate commerce.

We find Hoyos's work tasks were not "necessary" for interstate commerce as his work primarily consisted of "cosmetic and minor body" detailing work and thus did not play a "direct and 'necessary role in the free flow of goods.'" *Saxon*, 142 S.Ct. at 1790. The record does not conclusively show Hoyos engaged in the transportation of goods across borders via the channels of interstate commerce. *See id.*; *see also Gordon*, 2022 WL 16945913 at *4 (explaining "[t]he record does not show that recruiters play a direct and necessary role in the transportation of goods across borders. The act of recruiting truck drivers for transportation companies does not actually move any goods"). Similarly, the record before us does not support Hoyos, as a BS-II, played a direct and necessary role in the transportation of goods across borders, or that conducting cosmetic and minor body work, actually moved any goods. *See Gordon*, 2022 WL 16945913 at *4.

Rather, according to Jacob Madrid, during the three weeks of Hoyos's employment as a BS-II, his work "almost entirely consisted of preparing vehicles for painting by sanding, taping, masking, and wrapping"[.] Hoyos also occasionally completed repairs such as "bumper repairs and paint refinishing." *See id.*

Accordingly, Hoyos is not exempt as a transportation worker, and the Arbitration Agreement is properly within the FAA's coverage.

## CONCLUSION

We have found the Arbitration Agreement valid and Mendoza's gross negligence claims pursuant to Article 16, § 26 of the Texas Constitution and § 408.001 of the Texas Labor Code is subject to the Arbitration Agreement. Rush did not waive its right to arbitration, and the record before us does not support a finding Hoyos was a transportation worker.

34

For these reasons, we reverse the trial court's judgment denying Rush's motion to stay proceedings and compel arbitration. We reverse the trial court's judgment denying Rush's motion to stay proceedings and compel arbitration as to Mendoza's claim for gross negligence.

YVONNE T. RODRIGUEZ, Chief Justice

September 1, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.
Palafox, J., dissenting